Ullmann Realty Company, Plaintiff, *v.* Kintara Tamur, Defendant.

(Supreme Court, New York Special Term, December, 1920.)

Constitutional law — constitutionality of the "Housing Laws" (Laws of 1920, chaps. 942, 944, 945, 947) — statutes — landlord and tenant — ejectment — Constitution, art. 6, § 1.

Ejectment — when motion for judgment on the pleadings denied — landlord and tenant — use and occupation — pleading — "Housing Laws" of 1920.

Duty to society implies that the absolute ownership of property carries with it the reciprocal duty of so managing its use that the common good and general welfare will be best conserved. (P. 547.)

The police power comprehends every law which in any way concerns the public welfare and in every case the validity and the legitimacy of its exercise is inextricably interwoven with the maxim *sic utere tuo ut alienum non laedas.* (P. 548.)

No constitutional right of an owner of real property in the city of New York, etc., was transgressed by the enactment of the statute known as the "Housing Laws" (Laws of 1920, chaps. 942, 944, 945, 947) which took effect September 27, 1920. (P. 571.)

The statute (Laws of 1920, chap. 947) which for the period of two years from the time of its enactment suspends the remedy of ejectment against tenants holding over after the termination of their leases, is not violative of section 1 of article 6 of the Constitution of the state, which declares that the Supreme Court is continued with general jurisdiction in law and equity. (P. 562.)

In an action of ejectment by the owner of a dwelling house in the city of New York in which the defendant, a monthly tenant from September 24, 1918, occupied an apartment, the complaint alleged that since September 24, 1920, defendant has withheld possession of the premises from plaintiff, that the reasonable value of the use and occupation thereof was a stated sum, and demanded judgment for possession of the premises.

The answer, besides a general denial, pleaded the remedies afforded by the recent legislation, known as the "Housing Laws" of 1920. *Held*, that plaintiff's motion for judgment on the pleadings will be denied.

Motion for judgment upon the pleadings.

Emanuel S. Cahn, for plaintiff.

Fred L. Carver, for defendant.

William D. Guthrie and Julius Henry Cohen, *amici curiæ.*

Wagner, J. The motion for judgment upon a complaint founded upon ejectment and an answer pleading in content the remedies afforded under the recent acts of the legislature of this state known as the Housing Laws squarely presents for determination the validity of said acts in their constitutional aspect.

The averments of the complainant, a domestic corporation, briefly stated, are that as owner of premises No. 435 East Sixty-sixth street, a dwelling house in which the defendant, a monthly tenant from September 24, 1918, occupied an apartment, the latter has withheld the possession of the same from the complainant since September 24, 1920; that the value of the use and occupation of the said apartment is reasonably worth the sum of thirty-five dollars per month, terminating in a prayer for judgment for both possession of the premises and a sum representing the value of the tenant's use and occupation since the alleged date of expiration.

The answer, denying the stated value of the use and occupation, pleads as a first defense the original relationship of landlord and tenant existing at a rental rate of twenty-three dollars per month under a monthly tenancy, with a subsequent increase in the sum

to the amount of thirty dollars monthly, and the plain-tiff's refusal to accept said sum tendered on September 24, 1920, which the tenant has ever since been ready and willing to pay.

The second defense interposed consists of the allegation that on September 20, 1920, after receipt of a notice from complainant that the rent would thereafter be increased to the sum of thirty-five dollars monthly, the plaintiff refused to accept tender of the thirty dollars offered by the tenant, with the further averment that such demand was solely for the purpose of illegally and unlawfully increasing the rent in excess of the reasonable value of the premises. For the purpose of the action and particularly this motion, and in order to obviate any dispute as to what the reasonable value of the premises was as contemplated by the sections of the acts under consideration, the parties expressly stipulated in writing annexed to the pleadings that such reasonable value at the present time and at the time of the institution of the suit was thirty dollars per month. The present motion, therefore, leads to a direct test of the validity of the above defenses and in turn the constitutionality of their enactments.

. The history of the recent legislative action with respect to the subject matter of this action may briefly be summarized as follows: For the purpose of meeting and coping with what the legislature deemed a crisis as to housing conditions unparalleled in modern times, and which it was convinced had reached a point of such acuteness during the year as to become a menace to the public health and safety and demanded immediate amelioration, on April 1, 1920, the legislature of this state duly assembled, under the recommendations and importunities to be hereafter adverted to, passed chapters 130 to 139 of the Laws of 1920, applicable alone to cities of the first class, and cities within

the county of Westchester, for a limited duration, in effect until the fall of 1922. These measures, palliating in effect, and productive of a vast lessening in the pressures of the moment, proved, however, under the practical test of continued administration but of surface relief and inadequate to meet the exigencies of the actual crisis. The situation plainly demanded immediate and more drastic treatment. There were conditions that constantly arose equally as unprovided for as unanticipated. The recurrence of evident oppression masked itself in different guise; situations at times appeared beyond the pale of the then remedial legislation. The astute advice of those learned in the meticulous observance of the rigid letter of the laws discovered ways and means of circumvention. The result was inevitably that which follows a subversion of the law's spirit to its technical phrase. Comprehension of scheme with plasticity obtainable to all contingencies that spring forth, and ability to give adequate aid in whatever form the demands may present themselves, is not so easy of origin.

Accordingly, and at the insistent behest of the mayor's committee, which had occupied a place commanding most intimate knowledge and contact with housing affairs, the governor's calling of a special session of the legislature resulted in the enactment on September 27, 1920, of the Laws of 1920, chapters 942 to 953, supplementary and amendatory of the former acts and calculated to more effectively meet the crisis still imminent and impending.

In brief, the new legislation herein sought to be construed and of consequence to the proceedings at bar is as follows:

1. Chapter 942, which regulates holdover summary dispossess proceedings, allowing the same to be instituted for four reasons, namely (a), where the present holdover is objectionable; (b) where the owner, being

a natural person, seeks in good faith to recover the premises for his personal occupancy; (c) where the owner wishes to demolish the premises, with the intention of constructing a new building; (d) where the premises have been sold to a corporation formed under a co-operative ownership plan.

2. Chapter 944 of the Laws of 1920, amending chapter 136 of the laws of the same year, providing that it shall be a defense by a tenant in an action for rent " that such rent is unjust and unreasonable and that the agreement under which the same is sought to be recovered is oppressive."

3. Chapter 945, dealing with summary dispossess proceedings for non-payment of rent, allowing the same to be brought where the rent is no greater than the amount for which the tenant was liable for the month preceding the default for which the proceeding is brought, and that in such a proceeding the reasonableness of the rent may be tested in substantially the same manner as in the action for rent which is regulated by chapter 944 of the said law.

4. Chapter 947, which amends the Code of Civil Procedure by adding the following new section thereto in reference to the recovery of the real property in an action in the Supreme Court.

The complaint on its face showing that the premises involved were used for dwelling purposes, and alleging no facts bringing the plaintiff within the exceptions specified in chapters 942 and 947, as well as the evident endeavor of plaintiff to avoid the inhibitions of section 944 admitted by plaintiff's counsel upon the argument, squarely presents the questions of alleged power and right. Does the deprivation of the landlord to the right to the remedy of ejectment under article 1 of title 1 of chapter 14 of the Code of Civil Procedure, covering actions to recover real property and the denial of any claim made for any rental that

might be in excess of the reasonable value of the use and occupation of the premises, under chapter 944, violate his rights under the Constitution?

The fundamental consideration at the outset, independent of any resulting power that may thereafter be applied, is one mainly of legislative propriety. If it should be found that the power exists as a lawful exercise of the prerogatives of the legislature in formulating a valid fiat to be applied to an existing emergency imperilling the welfare of the people of the state, the primary inquiry upon which their validity rests must necessarily be with respect to the actual necessity of the situation. Extraordinary statute law implies unusual need. Special demands must become so insistent that the failure of ordinary remedies but accentuates the requirement of supplemental and additional repairment. It is only when the facts, evidence and information before it do not furnish reasonable grounds for belief that the intended legislation is conducive to the public safety that the lawmakers exceed the limits of their granted power. The legislature had submitted to it ample evidence of housing perils to justify their immediate and serious attention. The governor of the state, by direct message, stressed the situation in the following words: '' It has been publicly stated by the Health Commissioner of the City of New York that this condition of uncertainty is alone a direct menace to the health and welfare of the community. The housing shortage leaves the citizen nowhere to turn; families have been broken up and dispersed generally through the city, or crowded and huddled into the homes of relatives until the health, welfare and morality of the community is seriously threatened  *  *  *. There is an abundance of evidence that undesirability or failure to pay rent is not in the majority of instances the basis of the application for the right of summary removal, but, on

the other hand, it is the operation of the profiteer who would remove the desirable and paying tenant in order to create a vacancy which may thereafter be offered to the highest bidder. As a result of this, families have been shifted from place to place without rhyme or reason, and the unscrupulous and selfish have profited immensely by it. October 1 was to be the height of the harvest. The state should step in and use its powers to disappoint them. If the present condition be not thus relieved and the health of the community continues to be menaced, then we have a grave public emergency to meet such as would confront us in a time of epidemic or of catastrophe.''

The respective reports of his reconstruction commission, the later constituted joint legislative committee on housing, and the specially appointed mayor's housing conference committee of the city of New York reiterated the crying need.*

This careful, long-continued study and examination which the legislature was entitled to consider, supplemented by the facts of common knowledge, which, as to local conditions, '' does not require evidence to establish its existence, but may be acted upon without proof '' (*Matter of Viemeister*, 179 N. Y. 240), made it the judge of the necessity of such enactments. Whether they had a reasonable relation to the protection of the public health, safety and welfare will be hereafter considered. Whether or not its subject matter was calculated to deal fully with the problem or differences of opinion as to the wisdom of its scheme is, of course, beside the mark, for it is not the court's function to determine the efficacy or wisdom of the legislative voice. Its duty is to ascertain whether, viewed in any

---

* See report of the joint legislative committee on housing transmitted September 20, 1920, pp. 3–7; Department of Health Bulletin, New Series, vol. 9, No. 42.

light, a reasonable legislative discretion can regard the subsequent enactment as not arbitrary, and as in the furtherance of the public interest. In this connection, in *People* v. *Griswold,* 213 N. Y. 92, the court said: " In determining whether statutory requirements are arbitrary, unreasonable or discriminating, it must be borne in mind that the choice of measures is for the legislature, who are presumed to have investigated the subject, and to have acted with reason, not from caprice. Legislation passed in the exercise of the police power must be reasonable in the sense that it must be based on reason as distinct from being wholly arbitrary or capricious, but when the legislature has power to legislate on a subject, the courts may only look into its enactment far enough to see whether it is in any view adapted to the end intended. If it is, the court must give it effect, however unwise they may regard it, or however much they might, if given the choice, prefer some other measure as more fit and appropriate."

It is sufficient that from the various reports of committees and commissions heretofore alluded to the lawmakers had reasonable grounds to find the existence of an emergency and the resultant endangerment of the public. Such is the legislative finding stated in prefatory declaration and persuasive to this and all courts of justice as to its warrant in the enactment of means to avert the crisis.

It would form no useful purpose in this opinion to rehearse the facts themselves in relation to the housing situation in this city which gave rise to the legislative action. A reading of the above cited reports of the various committees is fully enlightening on the subject. The intimacy of contact by every individual resident of the community confirms the verity of their content. The appalling conditions of family life in

certain sections of this community has already been the subject of judicial discussion and concern. A public menace threatening wholesale evictions had been overhanging thousands of tenants in this city; exorbitant and extortionate demands for rent had been met with the impossibility of compliance; the consequent congestion which these conditions lead to became perilous to public health, safety, and morals. The condition was a breeder of discontent, and such a stalker for unrest as to become an object of apprehension as to the future good order of society.

The necessity of the remedy being apparent it remains to consider whether the legislature was invested with the constitutional power which it has exercised. Ultimately the inquiry confronting us narrows down to the proposition whether in a time of public emergency affecting the homes and shelter of the people, endangering their health and safety, the result of an upheaval of the conditions following a world war, there exists such power and authority in governmental function as to provide that the people in the face of oppressive demands should not be summarily evicted and ejected from their homes and unprovided with shelter during the continuance of the emergency, when at all times willing, and, in fact, offer to pay for the use of the premises occupied by them a reasonable rental value, and whether they should be permitted to interpose in proceedings brought the defense that the rent sued for is unjust, unreasonable in amount and oppressive in character.

Indisputable must be the observation that the " raison d'etre " for the very existence of a representative government as ours and, in the exercise of its function, is the protection and welfare of the people who form its component parts and who, in fact, constitute the state. That philosophy underlies our wholo

system, as evidenced by the avowed intentions of its creators at the time of its birth, and has formed the basis of the repeated interpretations of its powers, as the same has for over a century been the subject of discriminate study of our courts. This material protection afforded the citizenry is the supreme purpose of all law, and the ultimate endeavor of those in whose hands the security of the public is from time to time placed. The source of said power and the reservoir from which it flows ceaselessly with a " flexibility and capacity for growth and adaptation " (*Hurtado* v. *California,* 110 U. S. 516, 530) is what is indefinably known and recognized as the general police power of the government. Duty to society implies that the absolute ownership of property carries with it the reciprocal duty of so managing its use that the common good and general welfare will best be conserved. As Chief Justice Shaw stated: " Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature under the governing and controlling power vested in them by the constitution may think necessary and expedient. * * * The power vested in the legislature by the constitution to make, obtain and establish all manner of wholesome and reasonable laws, statutes and ordinances, * * * not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or possible limits to its exercise." *Commonwealth* v. *Alger,* 7 Cush. (Mass.) 53, 85.

It would seem that its scope is boundless, impossible of accurate future limitation, and requiring but one

and one only foundation. It comprehends every law which in any way concerns the welfare of the public. It matters not whether rights or duties are involved. No distinction is made between relations which may be private or public, nor of its rights whether personal or pertaining to property. The validity and legitimacy of its exercise is inextricably interwoven in every case with the maxim *sic utere tuo ut alienum non laedas;* the preservation of the health, welfare and morals of the public its constant aim; every matter thereto essential it includes; to every great public need it extends its arms. *Camfield* v. *United States,* 167 U. S. 518. Its comprehension of everything pertaining to the government's solicitude for the welfare of its people is perhaps nowhere better stated than in the case of *Lawton* v. *Steele,* 152 U. S. 133, 136, where the court said: '' It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the State may order the destruction of a house falling to decay or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane, or those afflicted with contagious diseases; the restraint of vagrants, beggars and habitual drunkards; the supervision of obscene publications, houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold.

Beyond this, however, the State may interfere whenever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine not only what the interests of the public require, but what means are necessary for the protection of such interests.''

In the *Slaughter House Cases,* 16 Wall. 36, the same court, in their opinion and discussion of the police power possessed by the several states, and with a farsighted view of the evils that naturally could arise to the inhabitants of overcrowded places, said: '' This power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of sound order, the life and health of the citizen, *the comfort of an existence in a thickly populated community,* the enjoyment of private and social life, and the beneficial use of property; it extends,'' says another eminent judge, '' to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the state    *   *   *   and persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health and prosperity of the state. Of the perfect right of the legislature to do this no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.''

I cannot subscribe to any doctrine that hinders or restrains our legislative power from enacting a clear and reasonable design to relieve the actual distress of the thousands of tenants in this community who would otherwise be made homeless. I think their rights to homes in which to live during an emergency of the kind which now confronts us is transcendently paramount to any private rights of property. The protection of their health and morals commands a vastly

more important position, to my mind, and of far greater moment to the welfare of the state than any strict adherence to the individual private rights. Exposure, disease, misery, would be the natural consequence and disaster to ensue if owners were permitted to turn the occupants of their houses into the streets upon the latter's inability to meet the oppressive and excessive demands that are now constantly, and as a matter of public knowledge, being made. With a clear grasp of the probabilities of the situation the legislature said that temporarily and during these unprecedented conditions the absolute right of owners to deal with property which they have hitherto used in the express business of sheltering and housing the public must bow and submit to regulation. Our constitutional government is not an impotent one. Not so readily can its arms of protection for those whose benefit it is imposed be bound and helpless; its scope and vision is wide; its power flexibly adaptable; its aim the protection of human rights. Our lawmaking body is restrained alone by the rule of reason as to the means adopted for the accomplishment of its purposes. To deny it such powers would be subversive of the principles upon which it was founded and of the postulates of dedication its creators avowed. It would deservedly be an indictment against and a reproach to our entire system of government. *Salus populi suprema lex.*

This fundamental concept permeates our entire law. '' But if it be within the power of the legislature to adopt such means for the protection of the lives of its citizens (referring to cases where the hours of labor in certain occupations were limited), it is difficult to see why precautions may not also be adopted for the protection of their health and morals. It is as much for the interest of the State that the public health

should be preserved as that life should be made secure," said the Supreme Court in *Holden* v. *Hardy*, 169 U. S. 366.

The court of last resort of our state, in *Matter of Cheesebrough*, 78 N. Y. 236, has thus referred to the state's inherent power in times of emergency: "The police power possessed by the State, and conferred by it upon municipal corporations, is very broad and far-reaching, and it is impossible to place upon it any precise limitations. By its exercise, in many cases rights of property and of person may be interfered with and largely impaired without any compensation. Nuisances may be abated by private persons without any liability to damages, and by the public without making any compensation, because no one has the legal right to maintain a public nuisance. In cases of actual necessity, as that of preventing the spread of fire, the ravages of a pestilence, the advance of a hostile army, and any other great calamity, the private property of any individual may be lawfully taken, used or destroyed for the general good, without subjecting the actors to personal responsibility. In such cases, the rights of private property must be made subservient to public welfare; and it is the imminent danger and the actual necessity which furnish the justification. *Salus populi suprema lex."* *Plate Glass Co.* v. *Meredith,* 4 Penn. 774; Potter Dwarris on Stat. 444; Cooley Const. Lim. (4th ed.) 713; Dillon on Mun. Corp. §§ 93–95; Sedg. Const. Law, §§ 423, 473.

Technical and ordinary rights can thus be temporarily interfered with or appropriated; necessity is its justification; the public welfare its basis. Bowed in submission, they stand suspended until the necessity passes away. It is but then that they take form again and are entitled to recognition.

*Litchfield* v. *Bond,* 186 N. Y. 73, is a restatement of

the rule: " It is to be observed, moreover, that the police power, which is concededly an inherent attribute of sovereignty, should be permitted to override or nullify our constitutional limitations only in cases of the highest public necessity. That governmental power, like every other, is subject to the Constitution, and when it is paramount it is because it is not limited by the Constitution, or because some immediate and overruling emergency. calls for the application of the maxim *salus populi suprema lex.*"

A condition of affairs existed concerning which our legislature exercised its granted right to enact laws for the protection of the health and welfare of its people. If the end be a legitimate one, all means, which are not arbitrary and oppressive but are appropriate and reasonable and adapted to that end, are within the legislative grant of power. I think there can be little doubt that the enactments in question bore a just relation to the protection of the public within the scope of its power and were reasonable and appropriate in character. The owner receives adequate compensation for the use of his property. If at the time of demand for increase he considers his return too low, the act affords him a means of recovery for " a fair and reasonable rent for the premises." Where he bonafidely desires it for his own immediate use no obstruction is placed in his way. In the event of a tenant's failure to pay any rent at all he is given a prompt and efficient remedy; in fact, the act (see chap. 944, §§ 5, 6) affords him a novel and extraordinary remedy, namely, the right to a warrant if a previous money judgment for rent or value of the premises is not with promptness paid. It makes as a condition precedent to the tenant's availing himself of the statutory defense the requirement of his payment into court of a sum equal to the last month's rent. The only im-

pairment of any property right heretofore appertaining is, during the continuance of the crisis, that of the right to evict and eject where the tenant has no other alternative than voluntary submission to extortionate demands. Instead of an entire deprivation with reasonable compensation, as admittedly would be the owner's return under the self-same police power exercised under the guise of eminent domain, here he retains title and receives a reasonable return therefrom. I think it unquestioned that this precise emergency would have justified the condemnation of lands and leaseholds for the purposes of shelter on payment of just compensation. The state here exacts even less from him. The same purpose, though, is achieved. The state obtains means of shelter for its inhabitants; the property owner ample and reasonable compensation for its use, adequately secured.

The right to set up a defense of a demand for oppressive rent is no novelty in the law. Statutory form given by the act to a right always existent lends to it no extra color or potency. Freedom from restraint, coercion and duress is but a restatement of the primary purpose of the police power. The governmental duty of protection against those in whose hands lay the instrument of oppression is coextensive with that against all other perils to life and safety. We find it aptly stated in the *Hardy Case, supra:* " But the fact that both parties are of full age and competent to contract does not necessarily deprive the State of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself. The state still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and when the individual health, safety and welfare are sacrificed

or neglected the State must suffer.'' To same effect see *People* v. *Schweinler Press,* 214 N. Y. 395.

Tenants here were constrained by the owner's power; they were confronted by disaster due to pecuniary inability of compliance; there was no range afforded them for the free exercise of judgment. All things led to the imposition of unfair conditions. Under such circumstances equity has ever given relief. Feeble tenantry never lacked the protection of the state. See 4 Gibbons' History of the Roman Empire (Harper ed.), 449; discussion in *Van Dyke* v. *Wood,* 60 App. Div. 212.

The case was not, as has been urged upon me with considerable sincerity of argument, where one of the parties to a contract is bound while the other can at will relieve himself from its obligation. The principle of mutuality implies an equal opportunity of bargaining. It can never obtain so as to place the perpetrator of oppression in a position where he can exact or extort inequity.

Moreover, the statutes, in only permitting the tenant to remain in possession upon condition that he pay the reasonable rental value, whatever its enhancement in amount might be, give express effect to the anciently recognized right or equity of '' chance ''— in other words, the tenant's equitable right of renewal. In Ireland it was formerly held that the fact that the tenant's name was on the rolls of the manor '' built him by slow degrees a fortress against unjust exactions and summary ejectments.'' Montgomery Land Tenure in Ireland, 90, 91.

O'Brien declared '' in England the tenant farmer was engaged to improve his land, knowing that at the expiration of his lease he would be granted a renewal at a reasonable rent.'' Economic History of Ireland in the Eighteenth Century, 68. The fight for recogni-

tion of this right was sharp and bitter, as evidenced by the history of land tenure in these countries, but the evolution was sure and ultimately secured the sanction of statute law. See Report of Bessborough Commission, appointed in 1881, and Irish Land Act of same year.

The tenant's right of renewal in equity was very early litigated in *Boyle* v. *Lysaght,* 1 Vern. & S. (1786–1788) 135–146.

The lord chancellor referred to the great difficulties that arose in courts of equity concerning leases, saying: " It happened that tenants neglected to make renewals upon the fall of the lives, and were guilty of great laches; landlords thereupon brought ejectments, and the tenants resorted to courts of equity for relief; the courts of equity, where the breach was made up by an adequate compensation, thought they were entitled to relief.  *  *  *  Courts of equity were very glad to lay hold of that rule, and in every case that came before them afterwards they held that the tenant was entitled to a renewal upon those terms, except in cases of fraud or dereliction." See also *Bateman* v. *Murray,* 1 Ridgeway's App. Cas. 187, where the reversal in the House of Lords resulted in the passage of acts 19 and 20, George III, 1779–80. To same effect see later statute of 6th Edw. VII (1906, chaps. 5, 6) and Scotch Small Landholders' Act of 1911 (1 & 2 Geo. V. Stat.) and vol. 49, p. 237, § 32.

Even of recent date chapter 97 of the acts of 1915 (5 & 6 Geo. V), dealing with the housing situation, is of compelling interest. Section 1, subdivision 3 therein, provides: " No order for the recovery of possession of a dwelling house to which this Act applies or for the ejectment of a tenant therefrom shall be made so long as the tenant continues to pay rent at the agreed rate as modified by this Act and performs

the other conditions of the tenancy, except on the ground that the tenant has committed waste, or has been guilty of conduct which is a nuisance or an annoyance to adjoining or neighboring occupiers, or that the premises are reasonably required by the landlord for the occupation of himself," etc.

Even without statute the Supreme Court of Maryland in 1876 gave force to the rule in *Banks* v. *Haskie,* 45 Md. 207. The tenant had been guilty of *laches* in failing to renew the lease and five months after an action of ejectment had been brought he filed a bill in equity (a little more than three years and nine months after the expiration of the original term) to enforce his right of redemption, the court holding: " The long use of this species of tenure by our people, the vast amount of property held under it, and involved in and to be affected by the general principle which our Courts may establish, as controlling the right of renewal of such leases, have, as appears to us raised a local equity here equally strong in favor of the lessees, as the like facts and circumstances, more than a century ago, raised in Ireland — an equity which we cannot overlook or disregard, and which constrains us to follow, and adopt the more liberal principles and practice of the Irish Courts in such cases. In so doing we are in nowise making new agreements for the parties in these cases, but simply enforcing and carrying out, what we understand to have been the original intention of the parties to such instruments, and make them subserve the purposes which they were originally designed to accomplish."

Renewal upon fair and equitable terms in the absence of fraud and objectionability was the underlying principle upon which the noted case of *Mitchell* v. *Reed,* 61 N. Y. 123, was based. There the court gave full recognition to the rule: " It has long been an

established practice to consider those who are in possession of lands under leases for lives or years as having an interest beyond the subsisting term, and this interest is usually termed the tenant right of renewal, which, though, according to language and ideas strictly legal, is not any certain, or even contingent estate, but only a chance, there being no means of compelling a renewal, yet is so adverted to in all transactions relative to leasehold property, that it influences the price in sales, and is often an inducement to accept of it in mortgages and settlements * * *. This ' tenant right ' of renewal, as it is termed, however imperfect or contingent in its nature, being still a thing of value, ought to be protected by the courts of justice, and when those who are entitled to its incidental advantages, whether by purchase or other derivation, are disappointed of them by fraud, imposition, misrepresentation, or unfair practice of any kind, it is fit and reasonable that this injury should have redress.   Accordingly, courts of equity have so far recognized the tenant right of renewal as frequently to interpose in its favor by decreeing that new or reversionary leases gained by means or supposition of the tenant right of renewal, should be for the benefit of the same persons as were interested in the ancient lease, and those who procured such new leases, and were legally possessed of them, should be trustees for that purpose."

It is clear that these statutes are but an embodiment of the above doctrine.   They are but emphatic memorials of long standing, custom and restraint evidenced by Irish, Scotch, English, Maryland and New York precedents.   To hold otherwise and nullify their salutary purposes would be closing our eyes to what has for hundreds of years been recognized.   To deny such remedy would amount to a reversion of our law to a régime of antiquity.

Historical reference to the growth of the law with reference to callings and trades, clothed with such a relation to public necessity and use as to render them subjects of general concern, affords further support of the present act's validity. Occupations and trades of farriers, millers, tailors, bakers and the like in olden times, it was observed, if left unregulated would practically become unlimited in their power to prey upon the people in the exaction of returns. Economic conditions invested them with a degree of interest to the public, the latter possessed an interest in their use. *Munn* v. *Illinois,* 94 U. S. 113, was the first definite announcement of the principle here, though from the standpoint of precedent clouded with a certain doubt as to whether the decision was not entirely based on the principle of monopoly. However, by degrees the doctrine, if initially impregnated upon this foundation, broke away (see *Budd* v. *New York,* 143 U. S. 517) until it took its true position in *German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389, where the true principle was finally laid down. The court there said, in speaking of this character of cases: "They demonstrate that a business by circumstances and its nature may rise from private to be of public concern and be subject in consequence to governmental regulation, and they demonstrate, to apply the language of Judge Andrews in *People* v. *Budd,* (117 N. Y. 1, 27), that the attempts made to place the right of public regulation in the cases in which it has been exerted and of which we have given examples upon the ground of special privilege conferred by the public on those affected cannot be supported. 'The underlying principle is that business of certain kinds holds such a peculiar relation to the public interests that there is superinduced upon it the right of public regulation.' "

We see its application in the regulation of such

private and competitive callings without special legislative permit as fire insurance, grain elevators, laundries and breadmaking. *Munn* v. *Illinois, supra; Budd* v. *New York, supra; German Alliance Ins. Co.* v. *Kansas, supra; Oklahoma Operating Co.* v. *Love,* 252 U. S. 331; *Mobile* v. *Yuile,* 3 Ala. (N. S.) 140.

Can it be given application in the above cases and denied in the instant case? If they were the subject of public interest to an extent warranting governmental interference, surely in this time of housing shortage the state is not pre-empted of power to shelter its people. I see no question of public interest in those cases superior to that appearing in the case at bar. The legislature is the unrestricted agent of the people; it possesses their full power. Surely the sovereign people are not helpless in a situation fraught with such imminent danger. Government is more than an empty form; assuredly it is clothed with adequate powers of remedy and protection to meet the demands of emergencies as they arise. " It would be a bold thing to say that the principle (warranting public regulation of private property and business) is fixed, inelastic in the precedents of the past and cannot be applied though modern economic conditions may make necessary or beneficial its application; in other words, to say that government possessed at one time a greater power to recognize the public interest in a business and its regulation to promote the general welfare than government possesses to-day." *German Alliance Ins. Co.* v. *Kansas, supra.*

The most recent decision on the subject, as yet unreported, is that of the District Court of the United States for the District of Indiana (Baker and Evans, C. J., and Geiger, D. J.) in the case of *American Coal Mining Co.* v. *Special Coal & Food Comm'n of Indiana,* decided September 6, 1920, where emphatic approval was given

Supreme Court, December, 1920. [Vol. 113.

to the legislative exercise of the police power in the creation of a coal commission, with authority to fix charges and reasonable prices at which coal should and must be sold within the state of Indiana. The act was passed on the assumption that coal had, by reason of shortage and emergency, become a commodity in which the public had an interest, and which the state therefore had a right to regulate in that interest. The court held the act constitutional, and declared that the state had the power to effect and regulate the coal mining business. In the course of its opinion it said: "There is no distinction as to the source of power of regulation. It all comes from the police power, dividing that into the two subject matters upon which the police power operates — the one based upon the public franchise or the like, and the other upon abuse of the theretofore existing right of private contract or private property — when in the one case you find that the evil to be cured is extortion and the remedy is price regulation, then in the other case, when extortion is also found to be the evil, you should apply the known remedy for extortion. The power is one; the evil is the same evil, and the remedy is drawn from the same reservoir, though from different faucets. There is no infringement of the right of a man to hold property. If under the power of eminent domain it is taken from him for a public use and the fair value of it is paid him, that is a constitutional thing, and there is no objection to it. So, when it comes to regulating the returns that he shall receive from his property, that is not taking his property; it is simply a control of his property as an instrument in his hand with which the Legislature has found that he has been bludgeoning the people."

Sharp assail is made against chapter 947, which for the period of two years suspends the remedy of ejectment in holdover cases after the termination of leases,

the reason for its enactment being tersely stated as follows in the joint legislative committee's explanatory note: "The summary proceeding of holdover being taken away a landlord can begin an action in the Supreme Court and recover judgment against the tenant by default in twenty days, and thus defeat the purpose of the legislature abolishing holdovers except in three instances." The ground of the objection seems to be based upon the claim that there results a partial destruction of the full jurisdiction of the Supreme Court granted by section 1 of article 6 of the Constitution of the state of New York, providing that: "The supreme court is continued with general jurisdiction in law and equity."

In other words, the contention is, in the main, that no existing remedy whatsoever can be suspended, impaired or taken away whatever the considerations as to the public health, safety and welfare may be at the time pressing themselves for expression to the legislative mind. I find no succinct or direct expression of such a proposition in the constitution itself, nor any implication pointing to such an inference. On the other hand, I find direct inference to the contrary, and as plain as I think language could express the framers' intention, that remedies should not be indestructible and fixed in form, but may, at the will of the legislature, be changed, suspended, or even destroyed.

Section 16 of article 1 reads: "Such parts of the common law and of the acts of the legislature of the colony of New York as together did form the law of the said colony on the nineteenth day of April, 1775, and the resolutions of the congress of the said colony, and of the convention of the state of New York in force on the twentieth day of April, 1777, which have not since expired, or been repealed or altered; and such acts of the legislature of this State, as are now in force, shall

be and continue the law of this State, subject to such alterations as the legislature shall make concerning the same.''

It follows that a holding to the effect that article 6, above alluded to, bars the lawmaking body in the exercise of its governmental authority from suspension or abridgment of a remedy which was theretofore obtaining would be tantamount to the complete nullification of a power clearly expressed in the Constitution itself. Of course, such is not the true construction of that instrument, nor is it the law. The question has already been before the Court of Appeals in *Matter of Stilwell,* 139 N. Y. 337. It was disposed of in this way: '' The general jurisdiction conferred upon the Supreme Court by the Constitution does not operate to prevent the legislature * * * from changing the common law, or from regulating and altering the jurisdiction and proceedings in law and equity in the same manner and to same extent as had been exercised by it before the Constitution of 1846 was adopted.''

The contention, if meritorious, would make irremovable and unamendable every right and remedy now existing, however strong the demand for change might be. It would make binding upon us and all future generations living under totally different circumstances and subject to changed economic laws the judgment of the past applicable to other conditions as enacted in statutory form. No matter what the development or change, how strong the pressure, how insistent the demands for relief, a growing people would forever be subject to a decadent, antiquated and outworn system of remedial forms.

The history and development of our procedures bear convincing evidence that such contention is based upon neither authority nor principle. Examples thereof abound. I might take occasion to refer to one that has

been called to my attention. Section 1780 of the Code of Civil Procedure forbids the Supreme Court to take jurisdiction over certain causes of action brought against foreign corporations by non-residents of the state. Prior to this law the Supreme Court had exercised jurisdiction in this class of cases in its discretion; the new act absolutely divested it of that discretion. Its validity was challenged upon this ground in *Payne* v. *New York, S. & W. R. R. Co.*, 157 App. Div. 302, where the court, in overruling the contention, said: " Nor do we think that section 1780, as aforesaid, so far as it regulates the exercise of the general jurisdiction of the Supreme Court, may be challenged properly as an attempt to deprive said court of some part of its general jurisdiction conferred upon it by the Constitution (Art. 6, § 1). The courts of this State are not bound generally to assume jurisdiction of causes of action arising outside of the State, which exist only between parties not residents of the State. *Collard* v. *Block*, 81 App. Div. 582. The provisions of section 1780, as aforesaid, disclose the public policy of this State as to actions by non-residents against foreign corporations, and in making the declaration the Legislature did not exceed its power." See to same effect *People ex rel. Crane* v. *Hahlo*, 228 N. Y. 309; *People ex rel. Ryan* v. *Green*, 58 id. 295.

The purpose and intent of the framers was not the perpetuation of any given remedy, but the continuance of this court as a court of general jurisdiction over all remedies which at any time exist. There is no prohibition of exercise of the police power barring any particular remedy. The effect of chapter 947 is simply that an action of ejectment is still maintainable in the Supreme Court in all cases where the public interest does not require its temporary suspension; being a procedural regulation it follows that: " Statutes regu-

lating legal remedies are generally construed as operative upon an existing condition of things as well as upon conditions to arise after their enactment." *Laird* v. *Carton,* 196 N. Y. 169; *Sackheim* v. *Pigueron,* 215 id. 62.

The defendant was in possession on September 27, 1920. The law provided that after that date no tenant then in possession should be evicted unless within the specified exceptions. No facts being alleged which would bring the landlord under these exceptions, the remedy of ejectment must be denied.

Insistent stress is made against the validity of the laws in question in respect to the claim of constitutional restraint against not only the impairment of contractual rights, but the ability to contract as one deems expedient. Unquestionably both results entail, but without defying constitutional limitations. The grant of power implies its application to a given status. Regulatory provisions must perforce, to a certain extent, create disturbances and changes in existing rights. By the same token, they prohibit or restrain former permissible latitudes of use. The mutual concessions thus made by the individuals form the sum and total of the common good for all. As has been frequently stated, underlying and qualifying every individual right are regulatory requirements made for the public interest. *Hadacheck* v. *Los Angeles,* 239 U. S. 394; *People ex rel. Nechamcus* v. *Warden,* 144 N. Y. 529. All rights are there dependent and of a subservient character. Thus in the *Legal Tender Cases,* 12 Wall. 551, the rule was at an early date defined: "As in a state of civil society property of the citizen or subject is ownership, subject to the lawful demands of the sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of the

contract can extend to the defeat of legitimate government authority.''

Alteration and even total destruction have thus resulted from its legitimate exercise. All contracts are made in the light of such possibility. Otherwise the police power — that salutary, ever-present supervision of the governmental eye — might at random by individual contracts entered into be so confined, restricted and circumscribed as to render it powerless. The powers of the state in this respect are not subject to estoppel by private parties. *Union Dry Goods Co.* v. *Georgia P. S. Corp.,* 248 U. S. 372; *Louisville & Nashville R. R. Co.* v. *Mottley,* 219 id. 467; *Douglas* v. *Kentucky,* 168 id. 488; *People ex rel. Village of South Glens Falls* v. *Public Service Commission,* 225 N. Y. 216; 12 C. J. 991–993.

Numerous authorities may be cited where, after a holding that a law was passed in the public interest and was reasonably calculated to subserve it, the exercise of the police power not merely interfered with, but impaired to a great degree and even destroyed contractual rights. To comment upon these would unreasonably lengthen this opinion. Their authority is clear and absolute. The following excerpts from the recent cases of *Union Dry Goods Co.* v. *Georgia P. S. Corp., supra,* and *Erie R. R. Co.* v. *Williams,* 233 U. S. 685, will suffice. In the former the court said: '' That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court. Thus in *Manigault* v. *Springs,* 199 U. S. 473, 480, it was declared that: ' It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from properly exercising such powers as are vested in it for the promotion of the common weal, or are

necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.' * * * In *Atlantic Coast Line R. R. Co.* v. *Goldsboro,* 232 U. S. 548, 558, the court said: 'It is settled that neither the 'contract' clause nor the 'due process' clause has the effect of over-riding the power of the State to establish all regula-tions that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdi-cated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise.'"

In the latter the court said: " * * * liberty of making contracts is subject to conditions in the interest of the public welfare, and which shall prevail — principle or condition — cannot be defined by any precise and universal formula. Each instance of asserted con-flict must be determined by itself, and it has been said many times that each act of legislation has the sup-port of the presumption that it is an exercise in the interest of the public."

This contention, of course, is unrelated entirely to the subject matter of the present suit where the ten-ancies are monthly, or from month to month, as the pleadings here show the tenancy at bar to be. The relation existing on September 24, 1920, between the parties was based not upon a contract made prior to that date, but upon a renewal thereof from month to month, and was in the minds of both parties made in contemplation of the existing law of April 1, 1920, then in force, permitting the interposition of such a defense.

As to the individual's liberty to contract, the well-established law presents no obstruction to the State's use of the police power. To contract as one chooses

or do as he wills never was the individual's absolute right. The boundaries of one's power to contract, though broad, still have limitations. As stated in *Chicago, B. & Q. R. R. Co.* v. *McGuire,* 219 U. S., 549: " The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community."

The challenge raised that the acts offend the due process clause of the State Constitution and the Fourteenth Amendment of the Federal Constitution is met by the interpretative observations of the court of last resort to the same effect respecting property rights. The cases universally denominate such taking as a taking by due process of law. *Noble State Bank* v. *Haskell,* 219 U. S. 104; *Eberle* v. *Michigan,* 232 id. 700; *Lincoln Trust Co.* v. *Williams Bldg. Corpn.,* 229 N. Y. 313; *Tenement House Dept.* v. *Moeschen,* 179 id. 325; *Cockroft* v. *Mitchell,* 187 App. Div. 189. It was stated in the latter case: " It is also true that in many instances, clearly so in the case at bar, compliance with these provisions may entail hardship upon the owners of buildings which at the time of their erection fully complied with all existing provisions of law. Hardship, however, does not mean confiscation, and unless it results from the unreasonable exercise of arbitrary power on the part of the Legislature, no degree of hardship can justify the court in nullifying legislative enactments embodying the will of the people, since it is the primary duty of the Legislature to protect the common interests of the whole people, even at the expense of personal or local interests."

Supreme Court, December, 1920.     [Vol. 113.

Vested property rights are therefore not at all times absolute and without limit. The law demands regard for the rights of others and allows an incidental injury, if not arbitrary and is in direct furtherance of the public good. See, also, to the same effect *Chicago, B. & Q. R. R. Co.* v. *Drainage Commrs.,* 200 U. S. 561.

Repugnancy to the constitution is claimed in that the acts constitute class legislation and make unreasonable and arbitrary distinctions between persons and different classes of persons and grant special and exclusive privileges and immunities for the benefit of certain ones. It is argued that they operate not on all rental property, but alone upon dwelling houses, in that respect effecting a virtual discrimination. Obviously no extensive discussion is required to point out the distinction between the ordinary dwelling house where persons make their permanent homes and hotels and rooming houses, mainly occupied by transient guests. The one is not comparable in importance, so far as it is a matter of public concern, to the other. The evil aimed at had its root in the one. To it alone the legislature properly addressed its attention. Indeed, similar classifications relating alone to the residential property have been upheld by our courts. *Cusack Co.* v. *City of Chicago,* 242 U. S. 526; *Welch* v. *Swasey,* 214 id. 91. Discrimination between a hold-over tenant who is in fact objectionable and one who is not is plainly reasonable. Permitting a natural person to retake possession for his own use while denying the same right to a corporate owner simply recognizes the fact only natural persons need homes.

Upon principle all regulation must needs in turn classify either persons, business or property. In that respect the law-making power is supreme. It can and does take up each class and apply to it different rules.

Its only limitation is a forbidance of exercise where the legislative action is inconceivable as resting upon reason and fact. *Price* v. *Illinois,* 238 U. S. 446; *Central Lumber Co.* v. *South Dakota,* 226 id. 157; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 id. 61; *People* v. *Havnor,* 149 N. Y. 195.

The Constitution only requires that those similarly situated shall be treated alike, not that all shall be subject to the same regulations. Where the circumstances differ the laws applicable may also differ. In the instant case all within the same class are alike affected and only different classes of persons under different conditions are subject to appropriate discriminations. The classification may rest upon even narrow distinctions. Said the court in *Rast* v. *Van Deman & Lewis,* 240 U. S. 342: " It is the duty and function of the legislature to discern and correct evils, and by evils we do not mean some definite injury but obstacles to a greater public welfare. *Eubank* v. *Richmond,* 226 U. S. 137, 142; \* \* \*. And, we repeat, ' it may make discriminations if founded on distinctions that we cannot pronounce unreasonable and purely arbitrary.' *Quong Wing* v. *Kirkendall,* 223 U. S. 59, 62, \* \* \*."

Nor is the applicability to cities of a million or more, or cities of the first class and counties adjoining, a denial of an equal protection of the laws. The menace existed entirely in densely populated sections. The emergency had to be met where it raised its threatening head. *People ex rel. Armstrong* v. *Warden,* 183 N. Y. 223; *Tenement House Dept.* v. *Moeschen,* 179 id. 325; *People ex rel. Einsfeld* v. *Murray,* 149 id. 367.

It may not be amiss to revert to recent observations made by several of my brothers, solely by way of dicta, as to the purport of these laws. It is observed

by one that the statutes in effect deprive the dwelling house owner of his " right to withdraw the grant by discontinuance of the use," at the same time admitting that the basis of leasing tenements is charged with a public use. Such contention clearly minimizes the extent of the police power to a point of virtual uselessness. On the other hand, *bona fide* intent of withdrawal is both recognized and given aid by the acts in question. Should the landlord wish to tear down his house or use it for personal purposes or grant it over to a co-operative group, who might desire to maintain it themselves, no former remedy is withheld from him. Both ejectment and summary proceedings are at his command and he can complain of no possible abridgment of remedy. If it is the absolute and arbitrary use of the premises inimical to the interests of the state and its people, with no inequitable burden cast upon the owner, that is referred to in the observation noted, the statutes accept the challenge and under the authorities heretofore mentioned are clothed with full and complete constitutionality.

Another has commented upon the inevitable lessening in the value of the use of property, where the liberty of one's action regarding it is curtailed as indicative of offense against constitutional rights. In the first place, the claim totally ignores the scope of the police power where the interests of the public require a curbing of hitherto unrestricted rights, and, secondly, that the reduction of the value of property or its use is insufficient of itself to invalidate the legislation. Deprivation in value does not constitute an invasion of the constitutional guarantees given to citizens. *Eberle* v. *Michigan, supra; Mugler* v. *Kansas,* 123 U. S. 623; *Beer Co.* v. *Mass.,* 97 id. 25.

*Hirsh* v. *Block,* 47 Wash. L. Repr. 378, where a divided court in the District of Columbia construed a

statute relating in part to housing conditions and held the same unconstitutional, is cited against the validity of the present acts. I regard the case as of no consequence or authority to the present inquiry. There it was attempted to regulate all rental property — stores, offices, hotels, as well as dwellings; and, more important, the statute expressly denied the right of trial by jury to owners in the prosecution of their claims for increased rentals thereof; the case involving only the right to possession of a store to be used for purely business purposes and entailing a denial of the undoubted right to a jury trial. I think it evident that the decision was correctly made and of no controlling import to the one at bar.

To summarize the above considerations would serve no useful purpose except of emphasis. Our Constitution is not so inflexible, unyielding and immovable that our lawmaking bodies lie prostrate at its feet, powerless to give legislative succor in the face of a peril threatening the health, morals and even the lives of the people.

For a century and a half our constitutional restraints have received interpretations befitting every emergency and public need. The statutes in question were enacted to avert a crisis. No constitutional right of the owner of property was transgressed. No sound reason is advanced that the governmental aid was not lawfully exerted.

Motion for judgment upon the pleadings denied, with appropriate costs.

Motion denied.